UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA ex rel.  :
TERENCE SASAKI, relator            :
                                   :
                Plaintiff,         :
                                   :
            -v-                    : 05 Civ. 6163 (LMM)(HBP)
                                   :
NEW YORK UNIVERSITY MEDICAL        : MEMORANDUM AND ORDER
CENTER and NEW YORK UNIVERSITY     :
SCHOOL OF MEDICINE,                :
                                   :
                Defendants.        :
- - - - - - - - - - - - - - - - - X

McKENNA, D.J.

      Defendants New York University Medical Center and
New York University School of Medicine (collectively,
"Defendants" or "NYU"), move for summary judgment pursuant
to Federal Rule of Civil Procedure 56 dismissing plaintiff-
relator Terence Sasaki's ("Plaintiff") claims brought under
the qui tam provisions of the False Claims Act, 31 U.S.C.
§§ 3729-3733.  For the reasons set forth below, Defendants'
motion is granted.

## I.  Background and Procedural History

### A.  NYU's Relationship with the Veteran's Administration

      Plaintiff's complaint arises out of an
educational and professional partnership between NYU and
the United States Department of Veterans Affairs ("VA"),
which operates the VA Medical Center in Manhattan, NY

("Manhattan VA").   As part of this relationship, NYU residents[1] and other physicians train at the Manhattan VA, which then reimburses NYU for the shared costs of providing a joint educational program.   (Defs. New York Univ. Medical Center and New York Univ. School of Medicine's Local Civil Rule 56.1 Stmt. of Material Facts Not in Dispute, Sept. 30, 2011, ("Defs.' Rule 56.1 Stmt.") ¶¶ 35, 39, 41; Pl.-Relator Terence Sasaki's Response to Defs.' Local [Civil] Rule 56.1 Stmt. of Material Facts Not in Dispute, Oct. 28, 2011, ("Pl.'s Rule 56.1 Stmt.") ¶¶ 35, 39, 41.)   The payments are governed by a "disbursement agreement" pursuant to which NYU invoices the Manhattan VA quarterly to bill for the number of approved "pay lines", or resident physician reimbursements.   (See Defs.' Rule 56.1 Stmt. ¶¶ 41, 43, 48, 49; Pl.'s Rule 56.1 Stmt. ¶¶ 41, 43, 48, 49.)

## B.  Plaintiff's Residency and Termination from NYU

In July 2000, Plaintiff began a medical residency at NYU in a combined program in neurology, radiology, and neuroradiology.   (See Defs.' Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Stmt. ¶ 1.)   As part of his residency, Plaintiff took part in medical rotations at the Manhattan VA.   (See Tr. of Dep. of Terence Sasaki, Aug. 12, 2010, attached as

---

[1] According to Plaintiff, NYU residents have graduated medical school, are licensed to practice medicine, and are employees of NYU.   (See Pl.-Relator Terence Sasaki's Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 14.)

Ex. A to Decl. of Brian A. Burns, Sept. 30, 2011, ("Burns Decl."), at 181:14-17.)   Between 2003 and 2004, NYU placed Plaintiff on remediation twice and on probation twice due to alleged academic and professional deficiencies.   (See Defs.' Rule 56.1 Stmt. ¶¶ 5, 7, 13, 15; Pl.'s Rule 56.1 Stmt. ¶¶ 5, 7, 13, 15.)   On May 18, 2005, NYU terminated Plaintiff from the combined program citing a failure to satisfy the requirements of Plaintiff's most recent probation.   (See Ltr. from Dr. Michael Ambrosino, Dr. Edmond A. Knopp, and Dr. Robert I. Grossman to Dr. Terence Sasaki, May 18, 2005 ("Termination Ltr."), attached as Ex. F to Burns Decl.)

On April 11, 2005, roughly one month prior to his termination, Plaintiff submitted a telephone complaint to the VA's Office of the Inspector General ("VA OIG") alleging that NYU was defrauding the Manhattan VA.   (See Hotline Input Transaction for Complaint Received Apr. 11, 2005, Aug. 3, 2005 ("Pl.'s Tel. Compl."), attached as Ex. 26 to Decl. of Charles M. Yoon in Opp'n to NYU's Mot. for Summ. J., Oct. 28, 2011 ("Yoon Decl.").)   In his telephone complaint, Plaintiff alleged, inter alia, that NYU radiology residents were not performing their duties at the Manhattan VA in person and that NYU was forcing residents to sign attendance sheets on behalf of others who

were not present during their required shifts at the Manhattan VA. (See id.) On Apr. 28, 2005, Plaintiff sent the VA OIG an email further delineating his complaint and alleging that after he raised his concerns with NYU, he was "immediately retaliated against" and harassed for his role as a "whistleblower". (See Email from Dr. Terence Sasaki to VA OIG Hotline, Apr. 28, 2005 ("Pl.'s Email Compl."), attached as Ex. 27 to Yoon Decl.)

## C. Plaintiff's Qui Tam Action

Following his termination and complaints to the VA OIG, Plaintiff brought this qui tam action on behalf of the government against NYU alleging violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. Plaintiff's complaint states two causes of action. First, Plaintiff alleges that NYU has violated FCA Section 3729 by fraudulently billing the Manhattan VA for the full amount of resident pay lines despite the fact that residents often do not show up for their assignments at the Manhattan VA. (See Verified Compl., July 1, 2005, ¶¶ 17, 18, 48.) Second, Plaintiff alleges that NYU has unlawfully retaliated against him for his complaints to the VA OIG, in violation of FCA Section 3730(h). (See id. ¶¶ 52-55.)

Following a period of investigation into Plaintiff's claims, the government declined to take over

the action pursuant to 31 U.S.C. § 3730(b)(4)(B). (See Unsealing Order, Sept. 3, 2008.) Defendants now seek to dismiss both of Plaintiff's causes of action on summary judgment.

## II. Discovery Issues

Before addressing Defendants' motion for summary judgment, the Court will address Plaintiff's request for clarification regarding various discovery matters. (See Ltr. from Heather S. Dixon to Court, June 27, 2011; Ltr. from Theodore K. Chang to Court, Nov. 30, 2011.)

On November 4, 2010, Magistrate Judge Pitman issued an oral ruling in this case denying Plaintiff's request for certain additional discovery. (See Tr. of Proceedings Before Mag. J., Nov. 5, 2010, attached as Ex. 1 to Pl.-Relator's Reply in Further Supp. of Objections to Non-Dispositive Ruling by the Mag. J., Dec. 9, 2010, at 116:23-117:20.) On December 10, 2010, this Court affirmed Magistrate Judge Pitman's ruling because Plaintiff had not shown that the ruling was clearly erroneous or contrary to law. (See Endorsed Mem., Dec. 10, 2010 (citing 28 U.S.C. § 636(b)(1)(A)).) On November 16, 2010, Magistrate Judge Pitman issued a second set of oral rulings again denying Plaintiff additional discovery. (See Tr. of Proceedings Before Mag. J., Nov. 16, 2010 ("Nov. 16, 2010, Tr."),

attached as Ex. 1 to Pl.-Relator's Objections to Non-Dispositive Rulings by the Mag. J., Mar. 4, 2011 ("Pl.'s Mar. 4, 2011, Objections"), at 32:15-33:3, 69:8-13, 74:10-75:5.)   On March 4, 2011, Plaintiff objected to the November 16, 2010, rulings (see Pl.'s Mar. 4, 2011, Objections), and on June 20, 2011, this Court issued another order via endorsement stating that "Plaintiff's objections to the November 2010 rulings of Magistrate Judge Pitman are overruled" (see Endorsed Mem., June 20, 2011).

Plaintiff now seeks clarification regarding "whether or not his objections to the November 16, 2010 rulings . . . were considered by [the Court] and ruled upon in the June 20, 2011 endorsement". (Ltr. from Heather S. Dixon to Court, June 27, 2011.)   The Court clarifies that it considered Plaintiff's objections to Magistrate Judge Pitman's November 16, 2010, rulings when issuing its June 20, 2011, order, and that the rulings are affirmed because Plaintiff has not shown that they are clearly erroneous or contrary to law.   See 28 U.S.C. § 636(b)(1)(A).

In the interest of alleviating any confusion, however, the Court will address each of Plaintiff's objections in detail.

Pursuant to Federal Rule of Civil Procedure 72(a), a district court "must consider timely objections

[to a magistrate judge's order] and modify or set aside any part of the order that is clearly erroneous or is contrary to law." See also 28 U.S.C. § 636(b)(1)(A) ("A judge . . . may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.")   "Under this highly deferential standard of review, magistrates are afforded broad discretion in resolving [non-dispositive] disputes and reversal is appropriate only if their discretion is abused." AMBAC Fin. Servs., LLC v. Bay Area Toll Auth., No. 09 Civ. 7062 (RJH), 2010 WL 4892678, at *2 (S.D.N.Y. Nov. 30, 2010) (citation omitted).   "The reviewing court must be left with the definite and firm conviction that a mistake has been committed to overturn the magistrate judge's resolution of a nondispositive matter." Id. (citation and internal quotation omitted).

Plaintiff makes multiple objections to Magistrate Judge Pitman's November 16, 2010, rulings.[2]   First, Plaintiff argues that Magistrate Judge Pitman erred by denying Plaintiff document discovery relating to (i) additional time periods of potential fraudulent conduct by

---

[2] Defendants question the timeliness of Plaintiff's objections.  (See Defs.' Mem. of Law in Opp'n to Pl.'s Rule 72(a) Objections to the Nov. 16, 2010 Rulings Made by Mag. J. Pitman, Apr. 20, 2011 ("Defs.' Discovery Mem."), at 12-13.)  For present purposes, the Court assumes, without deciding, that Plaintiff's objections are timely and overrules them in any event.

NYU; (ii) medical departments other than radiology, specifically emergency medicine and psychiatry; and (iii) the work and coverage provided by NYU attending physicians. (See Pl.'s Mar. 4, 2011, Objections at 8.) Second, Plaintiff objects to Magistrate Judge Pitman's denial of two additional depositions, both of radiology doctors who, Plaintiff argues, may have knowledge relevant to Plaintiff's claims. (See id. at 20.)

### A.  Document Discovery

At the November 16, 2010, conference, Magistrate Judge Pitman reviewed information supplied by Plaintiff in support of additional document discovery, which included an affidavit from the Plaintiff himself, and concluded that it was "speculative". (Nov. 16, 2010, Tr. at 19:9.) Magistrate Judge Pitman further explained that expanding discovery in a case on the "cusp of dispositive motions", "is just going to result in undue delay and undue resolution of the claims that are asserted." (Id. at 32:15-33:3.) He also expressed concern that Plaintiff's complaint did not put Defendants on notice that other medical departments were involved in the allegations, notwithstanding Plaintiff's counsel's belief that departments such as psychiatry and emergency medicine were "contained within [their] original characterization" of

Plaintiff's combined program of study.  (Id. at 30:19-31:24, 33:4-8; see also Compl. ¶¶ 11, 18-19, 22-24.) Finally, Magistrate Judge Pitman questioned whether the United States would have a right to separately investigate new allegations with respect to the additional departments--a development that would likely delay the case further. (Nov. 16, 2010, Tr. at 33:8-10.)   These rulings are well within the ambit of Magistrate Judge Pitman's broad discretion concerning non-dispositive disputes (see AMBAC Fin. Servs., 2010 WL 4892678, at *2), and are neither clearly erroneous nor contrary to law.  The Court therefore overrules Plaintiff's objections.

### B.  Additional Depositions

Federal Rule of Civil Procedure 30(a)(2)(A) "presumptively caps the number of depositions in a case at ten, and Rule 26 gives district courts broad authority to limit discovery, taking into account the needs of the case and other relevant factors."  Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 342 (S.D.N.Y. 2000). Rule 26(b)(2)(C) states that a court "must limit the frequency or extent of discovery" if it finds that

> "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the

> party seeking discovery has had ample
> opportunity to obtain the information
> by discovery in the action; or (iii)
> the burden or expense of the proposed
> discovery outweighs its likely benefit,
> considering the needs of the case, the
> amount in controversy, the parties'
> resources, the importance of the issues
> at stake in the action, and the
> importance of the discovery in
> resolving the issues."

As Magistrate Judge Pitman noted, Plaintiff had at the time of his request already taken 10 depositions. (Nov. 16, 2010, Tr. at 56:3-6.) Since then, Plaintiff has taken three more depositions. (See Defs.' Discovery Mem. at 6.) Nonetheless, Plaintiff sought to depose an additional NYU doctor, Dr. Grossman, who had signed the letter terminating Plaintiff from the NYU program. (Id. at 53:8-17.) However, Plaintiff's counsel acknowledged at the hearing that the letter outlines the reasons for which NYU terminated Plaintiff, and Defendants' counsel noted that Plaintiff's termination had been addressed in other depositions. (Id. at 53:18-54:25.) Plaintiff also sought to ask Dr. Grossman whether he signed a "program letter agreement" between NYU and the Manhattan VA and whether NYU was responsible for the monetary claims it submitted to the VA hospital. (Id. at 56:14-19, 58:3-4, 62:9-20.) However, Magistrate Judge Pitman ordered the production of the program letter agreement itself, and counsel for NYU

acknowledged that NYU was responsible for claims submitted. (Id. at 63:8-16, 69:8-13.)   Accordingly, Magistrate Judge Pitman reasonably concluded that a deposition of Dr. Grossman was unnecessary.   (Id. at 69:8-13.)   This ruling was neither clearly erroneous nor contrary to law.

Finally, Plaintiff sought to depose a Dr. Kantor because he "was the chief of radiology at the VA [hospital] in Brooklyn" and because in 2001, he "expressed concern about the lack of residents showing up at the Brooklyn VA [hospital] and providing coverage there."   (Id. at 69:15-71:1.)   However, as Magistrate Judge Pitman noted and Plaintiff's counsel admitted, because Dr. Kantor was based in Brooklyn, he was unlikely to have first-hand knowledge of the practices undertaken at the Manhattan VA hospital--the subject of Plaintiff's complaint--in the relevant time period.   (Id. at 72:6-12.)   Thus, Magistrate Judge Pitman reasonably denied Plaintiff's application to depose Dr. Kantor as well, and that decision was neither clearly erroneous nor contrary to law.   (Id. at 74:10-75:5.)

### III. Defendants' Motion for Summary Judgment

#### A.  Summary Judgment Standard

This Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law". Fed. R. Civ. P. 56(a). "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'"; "'[a] fact is material if it might affect the outcome of the suit under the governing law'". Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quoting Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). However, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002) (citations omitted).

"The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw

all reasonable inferences in favor of that party, and to eschew credibility assessments.'" Metito (Overseas) Ltd. v. Gen. Elec. Co., 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009) (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004)). "However, the 'mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient' to withstand a motion for summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

### B.  Timeliness of the Motion

Before addressing the merits of Defendants' motion for summary judgment, the Court considers Plaintiff's contention that the motion is untimely.

### i)  Fed. R. Civ. P. 56(b)

Plaintiff argues that Defendants' motion is late because it was brought after the 30-day window following the completion of discovery set forth in Federal Rule of Civil Procedure 56(b).[3]  According to Plaintiff, Defendants "must now be taking the position that discovery has concluded in this case," and yet the last possible discovery-related activity was Magistrate Judge Pitman's August 23, 2011, order denying in part and granting in part

---

[3] Rule 56(b) states that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."

various discovery requests by Plaintiff. (Pl.'s Mem. at 14.) Thus, because Defendants filed their summary judgment motion on September 30, 2011, Plaintiff argues that the motion comes 8 days too late. (Id.)

Magistrate Judge Pitman's August 23 order in part required the VA to produce additional documents by September 16, 2011. (See Mem. Op. and Order, Aug. 23, 2011, at 14-18, 20-23.) Thus, on its face, that order cannot be said to have closed discovery 30 days prior to Defendants' motion for summary judgment. In addition, Plaintiff himself acknowledges that discovery has not yet closed. (Pl.'s Mem. at 14, 24-25.) Thus, there is simply no basis on which to conclude that Defendants have run afoul of the 30-day time limit of Rule 56(b).

**ii)   Rule 56(d)**

Plaintiff next argues that if Defendants' motion is not late, it must be premature because "there is still significant and essential discovery outstanding." (Id. at 24-25.) Federal Rule of Civil Procedure 56(d) states that a court may deny or defer a summary judgment motion, allow time for additional discovery, or issue any other appropriate order "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." In the Second

Circuit, an affidavit submitted pursuant to Rule 56(d) (formerly Rule 56(f)) must state "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." Shaheen v. Naughton, 222 Fed. Appx. 11, 13 (2d Cir. 2007) (citations omitted).   A court may refuse additional discovery "if it deems the request to be based on speculation as to what potentially could be discovered." Id. (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Plaintiff's counsel represents via declaration that some of the additional discovery being sought pertains to additional NYU medical departments, other physicians, and additional time periods.  (Yoon Decl. ¶ 53.)  Because the Court has affirmed Magistrate Judge Pitman's November 16, 2010, denial of that discovery, as discussed above, it cannot support Plaintiff's argument here.

The declaration also states that Plaintiff wishes to obtain documents relating to "NYU's retention policies", which the Court takes to mean "document retention policies", and to take additional depositions of radiology residents.  (Id. ¶¶ 54-55.)  However, the declaration does

not explain how these might reasonably be material to the disposition of this case. Indeed, Plaintiff seeks information concerning NYU's document retention policies not for purposes of replying to Defendants' summary judgment motion, but rather to make a spoliation motion. (Id.) Similarly, Plaintiff makes no effort to explain the need for depositions of additional radiology residents beyond speculating, without evidentiary support, that the residents already deposed were somehow "improperly solicited and commandeered by NYU". (Id.)

Because Plaintiff has not identified any additional discovery that could reasonably raise issues of material fact, the Court finds that Plaintiff's arguments pursuant to Rule 56(d) are unavailing, and that Defendants' motion for summary judgment is timely.

## C. Plaintiff's First Cause of Action for Violation of the False Claims Act, 31 U.S.C. §3729

Under the version of the FCA applicable to this case, a party is liable if he or she, among other acts, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2005).[4] To establish a violation, a

---

[4] Congress amended the FCA in 2009 to, inter alia, alter the wording of Section 3729. See Fraud Enforcement and Recovery Act of 2009 (FERA),

plaintiff "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." U.S. ex rel. Mikes v. Strauss, 274 F.3d 687, 695 (2d Cir. 2001). "The central question under the False Claims Act is whether the defendant actually presented a 'false or fraudulent claim' to the government." Johnson v. Univ. of Rochester Med. Ctr., 686 F. Supp. 2d 259, 265 (W.D.N.Y. 2010) (citation omitted).

The version of the FCA that applies to Plaintiff's complaint defined a "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (2005). Although the FCA does not define "false or fraudulent", the Second Circuit has held that these words used in conjunction "suggest an

---

Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1617, 1621. However, with certain exceptions not relevant here, the 2009 amendments apply only to conduct occurring on or after May 20, 2009, the date of the amendment's enactment. See id. § 4(f), 123 Stat. at 1625. Because Defendants' conduct is alleged to have occurred prior to 2009 (see Compl. ¶¶ 11-46), the Court evaluates Plaintiff's causes of action pursuant to the version of the FCA in effect at that time, and all citations to the FCA herein are to the pre-2009 amendment version. The parties agree. (See Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 13 (quoting pre-amendment FCA); Pl.'s Mem. at 15 n.22.) In any event, the Court finds that the disposition of Defendants' motion would be the same under the amended version of the Act.

improper claim is aimed at extracting money the government otherwise would not have paid." Mikes, 274 F.3d at 696. As other courts have recognized, "[t]he paradigmatic example of a false claim under the FCA is a false invoice or bill for goods or services." United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995) (citation omitted).

The FCA defines "knowingly" as having "actual knowledge," or acting in "deliberate ignorance" or with "reckless disregard" of truth or falsity. 31 U.S.C. § 3729(b) (2005). Thus, the requisite intent is more than negligence or innocent mistake. Mikes, 274 F.3d at 703 (citation omitted). Put another way, "knowingly" presenting a false claim "does not mean the claim is incorrect as a matter of proper accounting, but rather means it is a lie." Id. (citation omitted).

Defendants argue that there is no factual support for Plaintiff's allegation that NYU submitted false or fraudulent claims to the Manhattan VA, and thus Plaintiff's first cause of action must be dismissed. (Defs.' Mem. at 15.) Defendants further argue that Plaintiff cannot meet the scienter requirement of the FCA because there is no evidence that Defendants submitted claims with actual knowledge, deliberate ignorance, or reckless disregard of their falsity. (Id. at 16.)

### i)   Submission of a False or Fraudulent Claim

According to Plaintiff, the disbursement agreement between NYU and the Manhattan VA required NYU to provide five radiology residents at the Manhattan VA "around the clock" and to "prorate its invoices for actual time rendered" by those residents. (Pl.'s Mem. at 15-16.) Plaintiff also contends that although the residents were to be "physically present" at the Manhattan VA during their shifts, doctors testified that "only one or two residents would appear at the Manhattan VA for duty" and that "each resident would only provide coverage for two to three hours per day," while night and weekend coverage was even more sporadic. (Id. at 16-17.)   Despite this, NYU allegedly continued to bill the Manhattan VA for "24/7 coverage for all five residents". (Id. at 17.)   Finally, Plaintiff contends that NYU staff meeting agendas show that it was common practice for residents to "sign the names of other, absent residents into sign-in logs at the Manhattan VA . . . ." (Id. at 6.)   For support, Plaintiff proffers sign-in sheets allegedly showing multiple resident names entered in the same handwriting. (Id.)

Defendants argue that the undisputed facts show that NYU's invoice submissions in the relevant time frame were "appropriate in all respects." (Defs.' Mem. at 15)

In addition, Defendants contend that Plaintiff has adduced no evidence that the disbursement agreement between NYU and the Manhattan VA actually requires "24/7" coverage by residents. (Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply Mem.") at 4.) Instead, Defendants believe the agreement is clear on its face that such coverage is not required. (Id. at 4.) Defendants also point to evidence that the Manhattan VA reviewed and authorized all of NYU's invoices in the relevant time period. (Defs.' Mem. at 15.) Thus, according to Defendants, even if NYU's invoices were somehow incorrect, the Manhattan VA was fully informed of the particulars of the claims, and thus those claims could not be fraudulent as a matter of law. (Defs.' Reply Mem. at 4-5.)[5]

    The Court agrees with Defendants that Plaintiff has failed to cite sufficient evidence of false or fraudulent claims made by NYU, and that Plaintiff's first cause of action fails as a matter of law.

    First, Plaintiff's interpretation of the disbursement agreement is not supported by the agreement's

_____

[5]  Defendants also argue for the first time in their reply brief that "a relator cannot make out an FCA claim based on a defendants' purported failure to comply with contractual obligations to the U.S. government." (Defs.' Reply Mem. at 3.) Courts generally do not consider arguments raised for the first time in a reply brief. See, e.g., James v. Orange County Correctional Facility, No. 09 Civ. 7226 (CM), 2011 WL 5834855, at *3 (S.D.N.Y. Nov. 18, 2011) (citations omitted). In any event, because Defendants' summary judgment motion is granted for other reasons as set forth herein, the Court need not address this argument.

plain language.   The agreement outlines the process by
which the Manhattan VA pays NYU in return for residents'
"VA duty", defined as "the number of days a VA resident is
physically present at the VA Medical Center and is
performing the normal and customary duties of a
postgraduate medical trainee in the care and treatment of
patients."   (Disbursement Agreement for VA House Staff
Stipends and Fringe Benefits ("Disbursement Agreement")
¶ 3, attached as Ex. 2 to Yoon Decl.)   However, this does
not mean, as Plaintiff argues, that during a day of VA
duty, a resident must be physically present at the
Manhattan VA "around the clock" or NYU must prorate its
invoice for that period. (See Pl.'s Mem. at 16.)   Instead,
the agreement makes clear that "the house staff member
[i.e., resident] may be physically absent but on call to
the VA Medical Center, or may be relieved from physical
presence for evening, Federal holiday, weekend, or approved
leave."   (Disbursement Agreement ¶ 3.)   Tellingly,
Plaintiff has pointed to no evidence that supports his
interpretation of the agreement.

        Second, Plaintiff has offered no evidence that
NYU improperly invoiced--i.e., submitted false claims to--
the Manhattan VA.   Using numbers that are unsubstantiated
by any documentation or testimony, Plaintiff estimates that

NYU billed the Manhattan VA for 24-hour, 7-day-a-week coverage by, on average, 144 doctors, five of whom were radiology residents. (Pl.'s Mem. at 3-4.) Thus, Plaintiff believes that NYU wrongly billed the Manhattan VA for some 24,192 hours of resident coverage and services each month because those residents were purportedly fulfilling their VA duties for only a fraction of the time required. (Id. n.5.) However, the invoices themselves make no reference to hours worked by NYU doctors. (See, e.g., Invoices from NYU Hospitals Center to Dep't of Veterans Affairs NY Harbor Healthcare Sys., attached as Ex. 1 to Yoon Decl. and as Exs. N, CC, DD, EE and FF to Burns Decl.) Thus, even if Plaintiff's "24/7" theory of billing were correct, the actual claims at issue in this case, the invoices, make no representations regarding the number of hours worked that could be "false or fraudulent", nor has Plaintiff proffered any evidence that NYU falsely or fraudulently misrepresented the nature or amount of those invoices in some other way.

Third, the disbursement agreement states that VA timekeeper records are "the sole determinant of whether a day of VA duty was satisfactorily performed by the house staff member." (Disbursement Agreement ¶ 7(c).) Yet Plaintiff cites no evidence that the Manhattan VA ever

found that NYU residents failed to perform their requisite number of "VA duty" days.[6]   Indeed, Dr. Hanson, the VA's Rule 30(b)(6) witness, testified that the VA reviewed and approved every invoice from NYU in the relevant time period, and that NYU satisfied the requirements of the disbursement agreement.   (See Tr. of Dep. of Richard Hanson, Sept. 16, 2010, ("Hanson Dep. Tr."), attached as Ex. L to Burns Decl., at 57:10-17 ("I would say that I approved the invoices, each one that came.  We did our due diligence as best we could to make sure that there were no errors in the billing process. . . .   And I would agree that . . . the VA and NYU satisfied the requirements of the disbursement agreement.").)   Plaintiff has offered no evidence to rebut this testimony.

Instead, Plaintiff attempts to frame Dr. Hanson's testimony as "irrelevant" because Dr. Hanson is the chief of neurology, not radiology, at the Manhattan VA.  (Pl.'s Mem. at 17.)   However, Dr. Hanson also was the Associate Chief of Staff for Education at the VA hospital, and

---

[6] Plaintiff cites only an NYU "House Staff Meeting Agenda" from 2001 that states: "1. Dr. Cantor [sic] inquired about few residents, possible cut in lines[;] 2. Assigning residents; must show-up and sign-in."  (See Pl. Mem. at 7 (citing House Staff Meeting Agendas at 2, attached as Ex. 17 to Yoon Decl.).)  Notwithstanding the fact that these statements, standing alone, do not support the weight that Plaintiff places on them, Plaintiff's counsel acknowledged before Magistrate Judge Pitman that Dr. Cantor would not have had firsthand knowledge of events at the Manhattan VA in the relevant time period. (See Nov. 16, 2010, Tr., at 72:6-9.)

therefore in charge of the education of medical residents, as well as responsible for overseeing the reimbursement of academic affiliates, such as NYU. (See Hanson Dep. Tr. at 10:16-24, 11:25-12:6.)  In addition, Dr. Hanson testified on behalf of the VA with respect to both the disbursement agreement and the "establishment of education, oversight, and payments for the radiology residents." (Id. at 12:14-13:6.)  Because he was the VA's Rule 30(b)(6) witness, Dr. Hanson's testimony is binding on the VA.  See Sabre v. First Dominion Capital, LLC, No. 01 Civ. 2145 (BSJ) (HBP), 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) (citing 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure § 2103 (2d ed. 1994)).

Finally, Plaintiff contends that the testimony of the "relevant radiology attending at the Manhattan VA (Dr. Howard Banner, Chief of Nuclear Medicine) directly supports Dr. Sasaki's claim that NYU did not provide all of the coverage/services for which they invoiced the Government". (Pl.'s Mem. at 17.)  But Dr. Banner's testimony cannot support that conclusion.  Dr. Banner simply stated that generally two residents would show up each day to his department at the Manhattan VA in 2003, and that he would read cases with those residents for about two to three hours per day. (See Tr. of Dep. of Howard J. Banner, Sept.

24

15, 2010, ("Banner Dep. Tr."), attached as Ex. 7 to Yoon
Decl., at 44:14-17, 109:2-5.)   He did not testify that
residents failed to satisfy their obligations pursuant to
NYU's agreement with the Manhattan VA in any way.   To the
contrary, Dr. Banner stated that there was never any
problem in the relevant time period with NYU residents not
showing up for service at the VA hospital.   (See Tr. of
Dep. of Howard J. Banner, Sept. 15, 2010, attached as Ex. A
to Reply Decl. of Brian A. Burns, Nov. 23, 2011, at 16:10-
16.)   In addition, Dr. Banner stated that he did not know
how much the VA paid NYU for resident services in any of
the years relevant to Plaintiff's claims (Banner Dep. Tr.
at 42:24-43:7), that he had never seen any invoices sent by
NYU to the VA (id. at 109:16-19), and that he had no
knowledge of NYU's billing activities (id. at 109:20-23).

In light of Plaintiff's failure to offer evidence
that supports his otherwise conclusory statements regarding
the disbursement agreement and NYU's invoices, Plaintiff
has failed to raise a genuine issue of material fact
regarding NYU's submission of false or fraudulent claims to
the Manhattan VA, and summary judgment for Defendants is
warranted.   See Davis, 316 F.3d at 100.

**ii)   Knowledge Requirement**

Even if Plaintiff raised a genuine issue of fact

concerning NYU's submission of false or fraudulent claims, Plaintiff's cause of action fails because Plaintiff has cited no evidence that NYU did so "knowingly".

Plaintiff argues that NYU knew that its invoices were false because NYU allegedly encouraged the "common practice" of residents entering the names of absent residents in sign-in sheets at the Manhattan VA. (Pl.'s Mem. at 6-8.) For support, Plaintiff points to sign-in sheets that allegedly show multiple resident names entered in the same handwriting as well as NYU meeting agendas referencing the Manhattan VA sign-in policy. (See id. at 6.) Plaintiff also relies on an affidavit from an NYU resident who acknowledged that residents would often sign in for others not present. (See Pl.'s Mem. at 6 (citing Aff. of Daniel Meltzer, Apr. 28, 2010, attached as Ex. 11 to Yoon Decl.).) However, whether or not individual residents signed the names of other, absent residents on attendance sheets at the Manhattan VA says nothing about the accuracy of NYU's invoices, let alone NYU's state of knowledge with respect to those invoices.

First, Dr. Hanson, the Manhattan VA's Rule 30(b)(6) deponent, gave unrebutted testimony that supervising attending physicians at the Manhattan VA were responsible for ensuring resident attendance at VA

rotations.  (See Hanson Dep. Tr., at 98:24-100:24.)  While
the Manhattan VA radiology department utilized sign-in
sheets, the VA did not require it or any other department
to do so, nor did the VA require NYU to maintain them.
(Id. at 101:8-15, 102:12-21.)  Ultimately, Plaintiff has
offered no evidence that the sheets, accurate or not, had
any bearing on NYU's submission of invoices--the actual
claims at issue.  Even if Plaintiff could establish that
the sign-in sheets reveal overbilling by NYU, absent any
indication of scienter on the part of NYU, the errors would
at most be one of accounting, not fraud, and thus not
actionable under the FCA.  See Mikes, 274 F.3d at 703 ("The
notion of presenting a claim known to be false does not
mean the claim is incorrect as a matter of proper
accounting, but rather means it is a lie.") (citation
omitted); see also id. ("[T]he requisite intent is the
knowing presentation of what is known to be false as
opposed to negligence or innocent mistake.") (citations and
quotation marks omitted).

        Second, the NYU staff meeting notes cannot
reasonably support Plaintiff's claim that NYU encouraged
residents to falsify attendance records.  The meeting notes
simply advise residents to comply with Manhattan VA
attendance guidelines and make use of sign-in sheets

provided by the Manhattan VA.   (<u>See, e.g.</u>, House Staff Meeting Agendas, attached as Ex. 14 to Yoon Decl., at 2 ("Assigning residents; must show-up and sign-in"), 6 ("VA Rotations: schedule has specific locations.   Please go where you are assigned to be."), 8 ("Be sure to sign-in at VA.").)   The notes make no mention of, nor can be said to raise any issue of fact concerning, NYU's knowledge, deliberate ignorance, or even reckless indifference concerning purportedly false or fraudulent invoices.

Finally, Plaintiff alleges that NYU knew residents were not satisfying their obligations at the Manhattan VA because NYU call schedules required residents to attend meetings, trainings, and other work assignments that "would necessarily preclude them from being at the Manhattan VA to provide the 24/7 coverage required under the Disbursement Agreement."   (Pl.'s Mem. at 19.)   But Plaintiff has provided no evidence that NYU residents left the Manhattan VA without the permission of a Manhattan VA supervisor, as allowed for under the disbursement agreement, or that NYU improperly billed the Manhattan VA for residents' "VA duty" days when those residents were in fact absent.

Because Plaintiff has failed to provide evidence supporting any material issue of fact with respect to NYU's

knowledge of allegedly false claims made to the Manhattan VA, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claim under 31 U.S.C. § 3729 for this reason as well.

### D. Plaintiff's Second Cause of Action for Retaliation Under the False Claims Act

Pursuant to 31 U.S.C. § 3730(h) (2005),

> [a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

Congress added this provision "to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime." Neal v. Honeywell Inc., 33 F.3d 860, 861 (7th Cir. 1994) (abrogated on other grounds by Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409 (2005)). "To sustain an action under Section 3730(h), a plaintiff must prove (1) that he engaged in conduct protected under the statute, (2) that defendants

were aware of his conduct, and (3) that he was terminated in retaliation for his conduct." U.S. ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ., 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006) (quotation marks and citation omitted).

Plaintiff alleges that in June 2004, shortly after he questioned one of NYU's attending physicians about "the propriety of NYU's relationship with and the policies regarding coverage at the Manhattan VA," NYU placed him on remediation, the first disciplinary step toward full termination. (Pl.'s Mem. at 9.) Four months later, NYU placed Plaintiff on probation, the next stage of the disciplinary process, citing his failure to pass mock oral examinations. (Id.) In April 2005, Plaintiff telephoned and emailed the VA Office of the Inspector General ("OIG") to report his concerns. (Id. at 10.) Then, on May 17, 2005, Plaintiff sent a fax outlining his complaint to the VA OIG using a fax machine in the office of Dr. Edmond Knopp, an attending physician at NYU. (Id.) After seeing a copy of his fax in Dr. Knopp's office the following day, Plaintiff was terminated from NYU's residency program and escorted off of the premises. (Id.) According to Plaintiff, the timing of these events, coupled with the fact that NYU did not terminate other residents whose academic performance and behavior were "comparable (or even

worse)" than Plaintiff's, necessarily means that Plaintiff was terminated in retaliation for his complaints regarding NYU's invoices to the Manhattan VA. (Id. at 11.) Plaintiff also claims that NYU has perpetuated its backlash by "blacklisting" Plaintiff from future employment, educational, and housing opportunities. (Id.)

   **i)  Protected Conduct**

      The first step in sustaining an action under 31 U.S.C. § 3730(h) requires proving that plaintiff engaged in "protected conduct". Sarafoglou, 451 F. Supp. 2d at 624. "To qualify as protected conduct an employee's actions must have been in furtherance of an action under the FCA, that is, an employee must have been investigating matters that were calculated, or reasonably could have lead [sic], to a viable FCA action." Garcia v. Aspira of New York, Inc., No. 07 Civ. 5600 (PKC), 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) (internal quotations and citations omitted). "Protected activity is interpreted broadly." Id. (citation omitted). Furthermore, a relator need not prevail on his or her FCA claim in order to recover for retaliation under 31 U.S.C. § 3730(h). See Hoyte v. Am. Nat'l Red Cross, 518 F.3d 61, 67 (D.C. Cir. 2008). However, a relator is required to show a "good faith basis", or "objectively reasonable basis", for believing that he or she was

investigating matters in support of a viable FCA case.  Id.
See also Lang v. Nw. Univ., 472 F.3d 493, 495 (7th Cir.
2006) ("What [an FCA relator] actually believed is
irrelevant, for people believe the most fantastic things in
perfect good faith; a kind heart but empty head is not
enough.  The right question is whether her belief had a
reasonable objective basis . . . .").

        The Court finds that Plaintiff has raised a
triable issue of fact concerning his alleged "protected
conduct".  Plaintiff submitted complaints to the VA OIG by
phone and email in April 2005, which in turn triggered an
inquiry by the Veterans Health Administration.  (See Pl.'s
Tel. Compl.; Pl.'s Email Compl.)  Although Plaintiff's
Section 3729 claim ultimately fails, as discussed above,
his complaints to the VA OIG reveal an objectively
reasonable basis for believing that he was investigating
matters that could have led to a viable FCA claim.  See,
e.g., Neal, 33 F.3d at 864 ("The statute expressly covers
investigatory activities preceding litigation. . . .
[S]upplying information that set off an investigation, fits
comfortably into this category.").

**ii)  NYU's Awareness of Plaintiff's Conduct**

        Plaintiff also has raised an issue of fact
regarding NYU's awareness of Plaintiff's protected conduct.

To satisfy 31 U.S.C. § 3130(h), a defendant "must know
. . . that plaintiff is engaged in protected activity as
defined above--that is, in activity that reasonably could
lead to a False Claims Act case." U.S. ex rel. Yesudian v.
Howard Univ., 153 F.3d 731, 742 (D.C. Cir. 1998); see also
U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir.
1996) ("[U]nless the employer is aware that the employee is
investigating fraud, the employer could not possess the
retaliatory intent necessary to establish a violation of §
3730(h).").

Plaintiff first argues that NYU was aware of his
protected conduct as of around June 2004 when he complained
to one of NYU's attending physicians, Dr. Elissa Kramer,
about NYU resident coverage at the Manhattan VA.   (Pl.'s
Mem. at 20.)   However, Plaintiff has not identified any
testimony or other evidence that references his alleged
discussion with Dr. Kramer, as is required to defeat a
motion for summary judgment.   See Davis, 316 F.3d at 100
(2d Cir. 2002) ("[R]eliance upon conclusory statements or
mere allegations is not sufficient to defeat a summary
judgment motion.") (citations omitted).[7]

---

[7] Despite referring in briefing to this alleged discussion several
times, Plaintiff cites no evidence of the discussion's occurrence or
content.  (See, e.g., Pl.'s Mem. at 9, 20, 22.)  Plaintiff also refers
to the discussion in his response to Defendants' statement of material
facts pursuant to Local Rule 56.1 (see Pl.'s Rule 56.1 Stmt. ¶¶ 28-29),

Nonetheless, Plaintiff has presented evidence that Defendants may have been aware of his protected conduct at least as of May 2005. The fax Plaintiff sent to the VA OIG on May 17, 2005, from the NYU fax machine of Dr. Knopp clearly indicates that Plaintiff had already submitted a complaint to the VA OIG. (See Fax to Inspector General, Dep't of Veterans Affairs, May 17, 2005 ("Pl.'s May 17, 2005, Fax"), attached as Ex. 28 to Yoon Decl.) Plaintiff also submitted an affidavit stating that he saw a copy of his fax on Dr. Knopp's desk the following day, shortly after which Plaintiff was terminated from his residency program and escorted off the premises. (See Decl. of Dr. Terence Sasaki in Opp'n to NYU's Mot. for Summ. J. ("Sasaki Decl.") ¶ 18.) This evidence raises a triable issue of fact regarding NYU's awareness of Plaintiff's allegedly protected conduct. See, e.g., Yesudian, 153 F.3d at 743 ("Threatening to file a qui tam suit or to make a report to the government . . . clearly is one way to make an employer aware.")

**iii)  Termination in Retaliation for Conduct**

To satisfy the final requirement for sustaining an action under Section 3730(h), and "to overcome a motion

---

but again fails to cite any supporting record evidence, in violation of Local Rule 56.1(d).  See Local Rules of the U.S. District Cts. for the S. and E. Districts of N.Y. ¶ 56.1(d).

for judgment as a matter of law (or summary judgment), an employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a qui tam action against it." Mikes v. Strauss, 889 F.Supp. 746, 753 (S.D.N.Y. 1995) (emphasis added).  "When an employer produces sufficient evidence to show a legitimate reason for a plaintiff's termination, there is no causal connection between allegedly protected activities and termination."  Liburd v. Bronx Lebanon Hosp. Ctr., No. 07 Civ. 11316 (HB), 2009 WL 900739, at *11 (S.D.N.Y. Apr. 3, 2009) (citation omitted).

Defendants have submitted ample, unrebutted evidence of independent grounds for Plaintiff's termination.  On February 27, 2003, prior to any complaint allegedly made by Plaintiff regarding NYU's invoicing practices, Dr. Robert Staudinger, the director of NYU's neurology residency program, reprimanded Plaintiff for "poor interpersonal and communication skills, demeaning behavior towards students and staff, and inappropriate chart documentation." (Ltr. from Dr. Robert Staudinger to Dr. Terence Sasaki, Feb. 27, 2003, attached as Ex. B to Burns Decl., at 1.)  Due to Plaintiff's performance

deficiencies, Dr. Staudinger informed Plaintiff that he was
to follow a plan of remediation.  (Id.)  On July 16, 2003,
Plaintiff received another letter notifying him that he
"unsuccessfully completed the remediation plan" and that he
was being placed on probation.  (See Ltr. from Dr. Peter
Kim Nelson, Dr. Michael Ambrosino, and Dr. Robert
Staudinger, July 16, 2003, attached as Ex. C to Burns
Decl., at 1.)  On June 29, 2004, after Plaintiff entered
the radiology portion of his residency program, Dr. Michael
Ambrosino, NYU's radiology residency director, and Dr. Alec
Megibow, NYU's vice chair of education, sent Plaintiff yet
another letter informing him of performance deficiencies
and again placing him in remediation.  (See Ltr. from Dr.
Michael Ambrosino and Dr. Alec Megibow, June 29, 2004,
attached as Ex. D to Burns Decl.)  The letter stated that
various faculty considered Plaintiff's performance to be
"below expectation", that Plaintiff had allegedly "missed
or misinterpreted findings in a number and significance
. . . which exceed those of [his] peers . . . at an
identical stage in their educations," and that "[t]hese
misses have had potential patient care consequences."  (Id.
at 1.)  At the conclusion of his remediation plan,
Plaintiff was required to take a mock oral exam, and
Plaintiff was notified that failure to complete the plan

satisfactorily could "lead to disciplinary action up to and including termination." (Id. at 2.) Plaintiff counter-signed the letter indicating his understanding of "the implications of the issues presented". (Id. at 3.)[8]

On October 4, 2004, Plaintiff received one more letter informing him that he was being placed on probation following poor performance during his mock oral exam. (See Ltr. from Dr. Michael M. Ambrosino, Dr. Alec J. Megibow, and Dr. Robert I. Grossman to Dr. Terence Sasaki, Oct. 4, 2004, attached as Ex. E to Burns Decl., at 1.) Plaintiff countersigned this letter as well, but wrote that he disagreed with the letter's findings as well as his probationary conditions. (See id. at 3.)[9] Plaintiff then appealed his probation, and an ad hoc committee of NYU doctors denied the appeal, noting that "[t]he Committee concurred, based on file information and direct testimony[,] that Dr. Sasaki had performed below the

_____

[8] Plaintiff now disputes the letter's findings regarding his performance, stating that Dr. Ambrosino's deposition testimony "revealed that he lacked a solid basis for making this statement". (Pl.'s Rule 56.1 Stmt. ¶ 12.) However, Dr. Ambrosino testified that Plaintiff made a "very severe miss" that could "kill a patient" on more than one occasion, and that although he did not have patient charts available at his deposition to confirm the number and type of misses Dr. Sasaki made, he had discussed the problem with the faculty "who review the cases" at the time of the letter. (Yoon Decl. Ex. 6 at 320-323.) Plaintiff has presented no credible evidence that Drs. Ambrosino and/or Megibow lacked a foundation for the findings made in the letter, which Plaintiff himself countersigned. (See Burns Decl. Ex. D at 3.)

[9] Plaintiff also now contends that his mock oral examination was administered and/or graded unfairly. (See, e.g., Pl.'s Rule 56.1 Stmt. ¶ 14.)

expected level of clinical competency for a resident in
training." (Ltr. from Dr. Robert Lembo to Dr. Carol
Bernstein, Apr. 14, 2005, attached as Ex. O to Burns Decl.,
at 1.) The committee also found the mock oral examination
to have been "an appropriate test of clinical competence"
and carried out in accordance with the general policies of
the American Board of Radiology. (Id. at 2.)

        While Plaintiff's probation appeal was pending,
Plaintiff again received two "below expectation"
evaluations in a radiology rotation, which Plaintiff does
not dispute. (See Termination Ltr. at 2, 4-5; Pl.'s Rule
56.1 Stmt. ¶ 21.) Several months later, yet still almost
two weeks before Plaintiff sent his fax to the VA OIG from
an NYU fax machine, Plaintiff received seven more "below
expectation" scores in an NYU neuroradiology evaluation.
(See Termination Ltr., at 7-9.) Finally, on May 18, 2005,
NYU notified Plaintiff that he had been terminated from his
educational program due to his performance deficiencies.
(See id. at 1.) Plaintiff appealed his termination, and an
ad hoc committee denied his appeal. (See Ltr. from Dr.
Carol A. Bernstein to Dr. Terence Sasaki, Oct. 18, 2005,
attached as Ex. I to Burns Decl.)

        In response to the above evidence, Plaintiff
cites his own oral or written objections to some, though

not all, of NYU's reprimands and warnings. (See Pl. Mem. at 23-24.)  Plaintiff also contends, without evidentiary support, that other residents who had similarly missed diagnoses were not placed on remediation, that other residents who had failed oral examinations were not placed on probation, and that other residents whose performances were "comparable (or even worse)" than Plaintiff's were not terminated from the program.  (Id. at 23.)  "Theories and beliefs, however, are not enough to survive summary judgment.  Evidence is required."  DiFolco v. MSNBC Cable L.L.C., No. 06 Civ. 4728 (LAP), 2011 WL 5519824, at *9 (S.D.N.Y.  Nov.  9,  2011);  see  also  Luckey  v.  Baxter Healthcare Corp., 2 F. Supp. 2d 1034, 1057 (N.D. Ill. 1998) (evidence of plaintiff's beliefs regarding alleged retaliation in violation 31 U.S.C. § 3730(h) "are insufficient to create a genuine issue of material fact").  "[D]efendants proffered a legitimate, non-retaliatory reason for [Plaintiff's] termination and [Plaintiff] failed to raise a genuine issue of material fact as to whether that reason was a pretext for retaliation."  Liburd v. Bronx Lebanon Hosp. Ctr., 372 Fed. Appx. 137, 139 (2d Cir. 2010).  Defendants are therefore entitled to summary judgment.[10]

---

[10] Plaintiff attempts to establish a causal nexus between his complaint

Finally, Plaintiff contends that NYU has continued to retaliate against him after his termination by "'blacklisting' him in the medical educational and employment community, defaming his reputation, and interfering with his ability to obtain housing." (Pl. Mem. at 24.)  However, Plaintiff again offers no evidence in support of these claims, and thus summary judgment for Defendants is warranted.

## IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in its entirety and Plaintiff's complaint is dismissed.


SO ORDERED.

Dated: January 25, 2012

_____
Lawrence M. McKenna
U.S.D.J.

---

to the VA OIG and his termination by noting that Dr. Knopp was involved in the final departmental evaluation leading to Plaintiff's termination and also may have seen Plaintiff's fax to the VA OIG referencing his complaint.  (Pl. Mem. at 23.)  However, Dr. Knopp participated in the final evaluation meeting on May 5, 2005 (see Termination Ltr., at 7-9), and Plaintiff did not send his fax to the VA OIG until May 17, 2005 (see Pl.'s May 17, 2005, Fax).